1  WO

2

3

4

5

6  **IN THE UNITED STATES DISTRICT COURT**

7  **FOR THE DISTRICT OF ARIZONA**

8

9  Ray Jerome Moleterno,                    No. CV-14-00135-PHX-BSB

10                     Plaintiff,            **ORDER**

11  v.

12  Carolyn W. Colvin,

13                     Defendant.

14

15       Ray Jerome Moleterno (Plaintiff) seeks judicial review of the final decision of the

16  Commissioner of Social Security (the Commissioner) denying his application for benefits

17  under the Social Security Act (the Act).  The parties have consented to proceed before a

18  United States Magistrate Judge pursuant to 28 U.S.C. § 636(b), and have filed briefs in

19  accordance with Local Rule of Civil Procedure 16.1.  For the following reasons, the Court

20  reverses the Commissioner's decision and remands for further proceedings.

21  **I.      Procedural Background**

22       On February 16, 2010, Plaintiff applied for disability insurance benefits and

23  supplemental security income under Titles II and XVI of the Act.[1]  (Tr. 17.)[2]  Plaintiff

24  alleged that he had been disabled since December 31, 2007.  (*Id*.)  After the Social

25  Security Administration (SSA) denied Plaintiff's initial application and his request for

26

27       [1] 20 C.F.R. part 404 addresses Title II of the Act, and has parallel citations in part
416, which addresses Title XVI.

28       [2] Citations to "Tr." are to the certified administrative transcript of record.
(Doc. 17.)

1  reconsideration, he requested a hearing before an administrative law judge (ALJ).  After

2  conducting a hearing, the ALJ issued a decision finding Plaintiff not disabled under the

3  Act.  (Tr. 17-29.)  This decision became the final decision of the Commissioner when the

4  Social Security Administration Appeals Council denied Plaintiff's request for review.

5  (Tr. 1-6); *see* 20 C.F.R. § 404.981 (explaining the effect of a disposition by the Appeals

6  Council).  Plaintiff now seeks judicial review of this decision pursuant to 42

7  U.S.C. § 405(g).

8  **II.    Medical Record**

9        The record before the Court establishes the following history of diagnosis and

10  treatment related to Plaintiff's health.[3]  The record also includes opinions from state

11  agency physicians who examined Plaintiff or reviewed the records related to his health,

12  but who did not provide treatment.

13        **A.    Medical Treatment**

14             **1.    Robert Garcia, M.D.**

15        Plaintiff received treatment from Dr. Garcia, a primary care physician, at

16  St. Joseph's Hospital Family Medicine Center.  (Tr. 51.)  On May 11, 2009, Plaintiff saw

17  Dr. Garcia for complaints of foot pain.  (Tr. 330.)  On June 25, 2009, Plaintiff returned to

18  Dr. Garcia and reported "bilateral hand arthralgias."  (Tr. 329.)  Plaintiff stated that he

19  had symmetrical pain in his wrists and hands that was present all day.  (*Id.*)  He also

20  reported ankle pain.  (*Id.*)  On examination, Plaintiff had "minimal tenderness of the

21  wrists bilaterally," no warmth, no decreased range of motion, and no other abnormalities.

22  He also had tenderness in his ankles.  (Tr. 329.)  Dr. Garcia assessed arthralgias of the

23  hands and stated that he would obtain a rheumatoid panel to rule out rheumatoid arthritis.

24  (*Id.*)

---

26        [3]  Plaintiff states that he limits his discussion of the medical record to information
27  relevant to his appeal, which focuses on Plaintiff's physical impairments and, therefore,
does not discuss psychological examinations that are contained in the record.  (Doc. 25 at
4.)  The Court similarly limits its discussion of the medical record.

28

On December 17, 2009, Plaintiff saw Dr. Garcia and reported right hip and knee pain related to a fall on December 12, 2009. (Tr. 328.) On examination, Plaintiff had "minimal tenderness to palpation of the trochanteric bursa and right knee laterally," and "no pinpoint tenderness." (*Id.*) Dr. Garcia noted that Plaintiff's right knee was stable and that his range of motion was "adequate." (*Id.*) Dr. Garcia assessed trauma to the right hip and knee related to the fall and recommended an x-ray because Plaintiff had a history of osteopenia. (*Id.*)

On January 19, 2010, Plaintiff presented with a "chief complaint of chest pressure." (Tr. 326.) He also reported grief related to his mother's recent death and stated that he had difficulty sleeping. (*Id.*) Plaintiff reported that he slept well for about four hours, but had trouble sleeping the "rest of the time" and had bad dreams. (*Id.*) On examination, Plaintiff had slightly decreased breath sounds, but otherwise his lungs were clear. (*Id.*)

On February 26, 2010, Plaintiff presented for a follow-up appointment related to his grief. (Tr. 324.) He also reported pain in his upper back and rib cage related to a fall he sustained when his dog knocked him over a few weeks before the appointment. Plaintiff also reported that he injured his hips and knees in that fall. (*Id.*) Dr. Garcia assessed, in pertinent part, soft tissue trauma secondary to a fall and stated that he would order x-rays of Plaintiff's left ribs and scapula. (*Id.*)

On April 20, 2010, Plaintiff saw Dr. Garcia with a "chief complaint of bilateral leg discomfort which [had] progressively increased over the past several weeks." (Tr. 451.) Plaintiff also reported pain in his feet and Achilles tendon region. The pain was worse "after standing from a prolonged sitting session." (*Id.*) Plaintiff did not report numbness, tingling, or neurologic deficits. (*Id.*) On examination, Dr. Garcia found that Plaintiff had "minimal tenderness in his posterior thigh region, otherwise unremarkable thigh exam." (*Id.*) Plaintiff's hips were unremarkable, his range of motion was adequate, and his knees were stable. (*Id.*) Plaintiff had some tenderness to palpation of his right anterior knee, mild tenderness of his heels, and a negative straight leg test bilaterally. (*Id.*) Dr. Garcia

assessed that Plaintiff's bilateral leg pain was "unremarkable and etiology was unclear." (*Id*.)  He advised Plaintiff to do stretching exercises and prescribed Percocet for "break through pain."  (*Id*.)

At a May 4, 2010 appointment, Plaintiff reported continued pain in his lower extremities, and discomfort in his shoulder, upper back, low back, and left lateral chest region.  (Tr. 450.)  Dr. Garcia noted that Plaintiff had not responded to "conservative treatment" for his pain.  (*Id*.)  On examination, Plaintiff had "point tenderness in his upper back region, tenderness in his lumbar region, tenderness to palpation in the left shoulder and left upper extremity, minimal tenderness in the lower extremities, and an unremarkable neurologic exam.  (*Id*.)  Dr. Garcia assessed diffuse musculoskeletal pain and noted that because "Plaintiff may have trigger points, although not classic, [he would] consider fibromyalgia" and consult a rheumatologist for a more definitive diagnosis. (Tr. 450.)  He started Plaintiff on physical therapy and prescribed Percocet for breakthrough pain.  (*Id*.)

On June 30, 2010, Plaintiff saw Dr. Garcia for a follow-up after blacking out. (Tr. 447.)  A CT scan of Plaintiff's head was unremarkable.  On July 15, 2010, Plaintiff saw Dr. Garcia for a follow-up after a stroke.  (Tr. 445.)  Dr. Garcia also noted that Plaintiff was there "to have a form filled out for disability.  Of significance is the fact that the patient also has fibromyalgia and has been seen by Dr. Gabriel Colceriu, a rheumatologist . . . ."  (*Id*.)  Dr. Garcia also noted that Plaintiff complained of headaches. (*Id*.)    Dr. Garcia stated that Plaintiff should continue his treatment regimen for fibromyalgia with Dr. Colceriu.  (Tr. 446.)

On August 10, 2010, Plaintiff again saw Dr. Garcia for a follow-up for his stroke. (Tr. 500.)   Plaintiff reported that he was doing physical therapy at home and was improving.  (*Id.*)  Plaintiff complained of left-sided back pain, upper chest discomfort, but had "no other complaints."  (*Id*.)  On examination, Plaintiff had some left-sided weakness.   Dr. Garcia stated that he would implement out-patient rehabilitation.

Dr. Garcia also stated that he "would hold off on [Plaintiff's] request for pain medication/narcotics [for his fibromyalgia] per Dr. Colceriu's recommendation." (*Id.*)

On September 16, 2010, Plaintiff saw Dr. Garcia with a "chief complaint of a lesion underneath the bottom of his right foot" that caused difficulty walking. (Tr. 495.) On examination, Plaintiff was in no acute distress, and had "two plantar wart lesions." (*Id.*) Otherwise, there was "[e]ssentially no change from previous examination." (*Id.*) Dr. Garcia recommended that Plaintiff continue treatment with Dr. Colceriu for fibromyalgia. (*Id.*)

On October 12, 2010, Plaintiff saw Dr. Garcia and reported left hip pain, neck discomfort, and tailbone discomfort after sustaining a fall. (Tr. 494.) He reported that he had scheduled a follow-up appointment with his rheumatologist for his fibromyalgia. (*Id.*)

On November 4, 2010, Plaintiff saw Dr. Garcia with a chief complaint of a cough. (Tr. 526.) He also reported that he episodes of "falling asleep." (Tr. 526.) On examination, Plaintiff did not have tenderness to his lower extremities on palpation. Dr. Garcia assessed a "slight flare up" of fibromyalgia and gave Plaintiff a "brief burst of Percocet" with no refills, "to be used sparingly." (*Id.*)

On December 2, 2010, Plaintiff reported that he continued to have chronic diffuse myalgias, which he thought were consistent with fibromyalgia. (Tr. 523.) He reported seeing Dr. Colceriu monthly and that he was "on maximum Neurontin." (*Id.*) On examination, he was in no acute distress, had diffuse nonspecific tenderness in his back, and no trigger points were noted. (*Id.*) Dr. Garcia prescribed Percocet every four to six hours as necessary, and advised Plaintiff to follow-up with Dr. Colceriu. (*Id.*)

On January 24, 2011, Plaintiff saw Dr. Garcia after hospitalization for a "small-bowel obstruction/ileus." (Tr. 562.) Plaintiff did not have any other complaints except for a cough. (*Id.*) On February 11, 2011, Dr Garcia saw Plaintiff for COPD. (Tr. 561.) Plaintiff also reported that his left knee had been locking. (*Id.*) On examination, Dr. Garcia found minimal tenderness of the medial meniscal region of Plaintiff's right

1    knee, but that his knee was stable.  (*Id.*)  Dr. Garcia recommended an MRI of the knee.

2    (*Id.*)

3          On June 25, 2011, Plaintiff presented with complaints of abdominal discomfort.

4    Dr. Garcia noted that Plaintiff had a history of irritable bowel syndrome.  (Tr. 558.)

5    Plaintiff also reported diffuse pain that he attributed to fibromyalgia.  (*Id.*)  Dr. Garcia

6    advised Plaintiff to follow-up with the rheumatologist for fibromyalgia and indicated "for

7    now will focus on control of pain."  (Tr. 559.)

8             **2.**    **Gabriel Colceriu, M.D.**

9          As previously noted, in May 2010, Dr. Garcia referred Plaintiff to rheumatologist

10    Dr. Colceriu at the St. Joseph's Hospital rheumatology clinic.  (Tr. 396-98.)  During a

11    May 28, 2010 musculoskeletal examination, Plaintiff reported developing diffuse

12    musculoskeletal pain "several months ago," and he reported that he was tired, had no

13    energy, and was unable to sleep at night.  (Tr. 396.)  He reported that Percocet helped, but

14    the pain relief did not last long.  He reported that "any sort of moving around, as well as

15    not moving at all, [made] his pain much worse."  (*Id.*)  Dr. Colceriu noted that Plaintiff's

16    reports raised the "possibility of chronic pain syndrome/fibromyalgia."  (*Id.*)

17          On examination, Plaintiff had full range of motion in his extremities, but was

18    positive for diffuse tenderness on palpation at multiple locations.  (Tr. 397.)  Dr. Colceriu

19    also found that Plaintiff's grip was intact and his ambulation was unassisted.  (*Id.*)

20    Dr. Colceriu noted that Plaintiff's reports and examination were consistent with

21    fibromyalgia.  (*Id.*)  Subsequent laboratory tests to rule out other etiologies of Plaintiff's

22    reported symptoms were negative, other than a severe vitamin D deficiency.  (Tr. 394-

23    95.)

24          During a June 11, 2010 appointment, Petitioner reported that he "had symptoms of

25    diffuse pain for more than two years; however, they ha[d] been accelerating over the last

26    few months to the point that he [was] not eating, not sleeping, and [was unable] to do

27    anything."  (Tr. 394.)  On examination, Plaintiff had no synovitis in his extremities, but

28    had diffuse tenderness on palpation over the fingertips and toes.  (*Id.*)  He had a full

1   passive range of motion.  (*Id*.)  Dr. Colceriu found that Plaintiff "fit the pattern for

2   [fibromyalgia] based on his diffuse pain, fatigue, disability, insomnia, and depression."

3   (Tr. 395.)  He prescribed Neurontin and an antidepressant, and advised Plaintiff to

4   become physically active and to engage in range of motion exercises to manage his

5   condition. (*Id*.)

6        At a July 8, 2010 appointment, Dr. Colceriu noted that Plaintiff had done a bit

7   better after starting Neurontin.  (Tr. 392.)  Plaintiff continued to report "diffuse achiness

8   throughout his body, slightly improved on Neurontin."  (*Id*.)  Plaintiff also reported

9   insomnia.  (*Id.*)  On examination, Plaintiff had no synovitis, but had diffuse tenderness on

10  palpation throughout, his hand grip was intact bilaterally, and his ambulation was

11  unassisted.  (*Id*.)  Dr. Colceriu assessed "[f]ibromyalgia/chronic pain syndrome

12  manifested by diffuse arthralgias, fatigue, insomnia, depression, and disability."

13  (Tr. 393.)  He noted that Plaintiff had responded "slightly" to Neurontin and increased his

14  dose.  (*Id*.)

15       On September 28, 2010, Plaintiff reported that he was initially better on the

16  increased dose of Neurontin, but that his improvement had "plateaued."  (Tr. 573.)  He

17  reported diffuse pain throughout his upper and lower extremities, but "was overall better

18  than when he started."  (*Id*.)  Plaintiff also reported that he was only sleeping four hours a

19  night and woke up tired.  (*Id*.)  On examination, Plaintiff had no synovitis, but had

20  "diffuse tenderness to palpation starting at the fingertips and ending at the toes."

21  (Tr. 574.)  His hand grip was decreased and he was using a walker.  (*Id*.)  Dr. Colceriu

22  again assessed "chronic pain syndrome/fibromyalgia, manifested by long history of

23  diffuse arthralgias, myalgias, fatigue, insomnia, depression, disability," noting there had

24  been some response to Neurontin and Celexa, and that Plaintiff felt better, but was "not

25  pain free."  (Tr. 574.)

26       During a December 28, 2010 appointment, Dr. Colceriu noted that the

27  medications' effectiveness had decreased over the past three months, and that Plaintiff's

28  pain had "pretty gone back to the level it was before."  (Tr. 569.)  Plaintiff reported that

he had chronic pain at a level six out of ten.  (*Id*.)  Plaintiff also reported that his sleep had gotten worse and he had less energy than usual.  (*Id*.)  On examination, Plaintiff had no synovitis, but had tenderness to palpation from his fingertips to his shoulders, his spinal and paraspinal areas were tender, and his knees, calves, and quadriceps were tender to palpation.   (Tr. 569.)   Plaintiff walked without assistance.   (Tr. 570.) Dr. Colceriu changed Plaintiff's prescriptions, tapering off previous medications and substituting Savella.  (*Id.*)

In May 2011, Dr. Colceriu noted that Plaintiff had been doing "okay" on Savella and that his pain was better controlled.  (Tr. 567.)  However, Petitioner reported that he had stopped taking Savella based on his belief the drug was related to his mood swings, and his pain had increased.  (*Id*.)  Dr. Colceriu restarted the drug.  (*Id.*)  On examination, Plaintiff had tenderness to palpation from head to toe, over the soft tissue, joints and muscles.  (*Id*.)  Dr. Colceriu assessed "fibromyalgia/chronic pain syndrome manifested by depression, fatigue, lack of energy, arthralgias, myalgias, [and] disability."  (*Id*.)

In July 2011 Dr. Colceriu noted that Plaintiff's "pain ha[d] gotten a little bit better upon resuming Savella, however, it [was] far away from being perfect."  (Tr. 565.) Plaintiff reported global pain, fatigue, insomnia, and lack of energy.  (*Id.*)   On examination, Dr. Colceriu noted eighteen out of eighteen positive tender points of fibromyalgia.  (*Id.*)  He assessed "chronic pain syndrome/fibromyalgia manifested by fatigue, depression, lack of energy, polymyalgia, and disability."  (*Id.*)  He noted that "Savella helped" and that Plaintiff was "getting involved in a fibromyalgia research trial" that involved monitoring symptoms.  (*Id*.)  A November 2011 examination showed diffuse tenderness at fibromyalgia trigger points.  (Tr. 654.)  Dr. Colceriu advised Plaintiff to "[c]ontinue Savella, don't expect major improvements from this point . . . pain mgmt [management]."  (*Id*.)

/ / /

/ / /

/ / /

- 8 -

### B.      Medical Opinion Evidence

#### 1.      Keith W. Cunningham, M.D.

On May 7, 2010, Dr. Cunningham examined Plaintiff as part of the initial review of Plaintiff's application for disability benefits.  (Tr. 350-56.)  Plaintiff complained that his "bones hurt," and described difficulty standing, walking, bending, lifting, and moving about.  (Tr. 350.)  Dr. Cunningham assessed pain syndrome, noting a limited range of motion of the cervical spine, with a history of cervical discectomy/fusion, mild thoracic kyphosis (hump-back), and a history of recurrent urinary tract infections and prostatitis currently under evaluation and treatment.  (Tr. 353.)

Dr. Cunningham completed a medical source statement of ability to do work-related physical activities.  (Tr. 353.)  He found physical functional abilities consistent with medium exertion, including occasionally lifting fifty pounds, frequently lifting ten pounds, and no limitations in sitting, standing, or walking.  (Tr. 353-54.)  He also found that Plaintiff could frequently climb ramps or stairs, stoop, crouch, and reach. Dr. Cunningham further found that Plaintiff could occasionally climb ladders, ropes, and scaffolds, and kneel.  (Tr. 354.)  Dr. Cunningham found that Plaintiff would be restricted when working around heights.  (Tr. 355.)  He found Plaintiff unlimited in his abilities to handle, finger, and feel.  (Tr. 354.)

#### 2.      Melanie Alarcio, M.D.

On February 12, 2011, Dr. Alarcio examined Plaintiff in connection with the State Agency's review of the initial denial of Plaintiff's application for benefits.  (Tr. 534-39.) In addition to examining Plaintiff, Dr. Alarcio noted that she reviewed September 16, 2010 and October 12, 2010 progress notes from Dr. Garcia, and two progress notes from a treating neurologist, Keri Patterson, M.D.  (Tr. 534.)

Plaintiff reported to Dr. Alarcio that he last worked in 2005 and did not return to work due to escalating medical issues.  (*Id.*)  He also reported chronic pain.  (Tr. 535.) On examination, Dr. Alarcio noted paravertebral muscle spasms, limited range of motion of the spine, and tenderness to palpation on both of Plaintiff's knees.  (Tr. 536-37.)  She

1    diagnosed "1. History of CVA [cerebral vascular accident] with mild left hemiparesis.

2    2. Degenerative disease affecting [Plaintiff's] spine status-post spinal fusion of his

3    cervical spine."   (Tr. 537.)   Dr. Alarcio noted that Plaintiff's past medical history

4    included osteopenia and fibromyalgia, but she did not include these conditions among her

5    diagnoses.      (Tr. 535, 537.)

6          Dr. Alarcio completed a functional assessment and found physical functional

7    abilities consistent with light work, including lifting twenty pounds occasionally and ten

8    pounds frequently, and an ability to sit, stand, or walk "6-8 hours in an 8-hour work day."

9    (Tr. 537-38.)  She also found that Plaintiff could occasionally stoop, kneel, crouch, crawl,

10   and reach, and that he was unrestricted in his abilities to handle, finger, or feel.  (Tr. 538.)

11                      **3.      James J. Green, M.D.**

12         On March 14, 2011, as part of the State Agency's reconsideration determination,

13   Dr. Green completed a physical residual functional capacity (RFC) assessment.  (Tr. 137-

14   38.)  He reviewed the records, but did not examine Plaintiff.  He assessed the same

15   functional limitations as Dr. Alarcio.  (*Compare* Tr. 137-38 *with* Tr. 537-38.)  He noted

16   Plaintiff's history of cervical degenerative disc disease, irritable bowel syndrome, and

17   reported joint pain.  (Tr. 138.)  He noted that Plaintiff "fell in 10/2010 with arthralgia,"

18   but he did not mention fibromyalgia in his assessment.  (*Id.*)

19                      **4.      Robert Garcia, M.D.**

20         In July 2010, Dr. Garcia completed a physical capacities assessment, a pain RFC

21   questionnaire, and a fibromyalgia RFC questionnaire.  (Admin. Hrg. Exs. 12F, 15F, 16F,

22   Tr. 388-90, 439-40, 441-43.)  He completed the physical capacities assessment just after

23   Plaintiff's stroke and based that assessment, in part, on "left hemiparesis from CVA

24   [cerebral vascular accident]."  (Tr. 388.)  Therefore, Plaintiff asserts that the assessment

25   did not necessarily assess limitations from Plaintiff's chronic impairments.  (Doc. 25 at 9

26   (citing Tr. 445 (Dr. Garcia's July 15, 2010 progress note stating that he was seeing

27   Plaintiff for "follow-up status post-hospitalization . . . for a CVA with left

28

1    hemiparesis . . . .on July 9, 2010 . . . .")).)  Plaintiff states that the July 2010 physical

2    capacities assessment "is irrelevant to [his] appeal."  (Doc. 25 at 10.)

3        On the fibromyalgia RFC questionnaire, Dr. Garcia confirmed that Plaintiff's

4    fibromyalgia met criteria established by the American College of Rheumatology.

5    (Tr. 441.)  He noted that the signs and symptoms of Plaintiff's fibromyalgia included

6    multiple tender points, nonrestorative sleep, frequent headaches, irritable bladder,

7    incoordination, severe fatigue, depression, anxiety, abdominal pain/diarrhea/constipation,

8    numbness and tingling of the extremities (on the left), vestibular dysfunction, morning

9    stiffness, and low back pain.  (Tr. 441.)

10       On the fibromyalgia RFC questionnaire, Dr. Garcia also rated Plaintiff's pain and

11   fatigue as severe (causing extreme impairment that precluded ability to function), and

12   opined that Plaintiff's pain and fatigue constantly interfered with attention and

13   concentration.     (Tr. 442-43.)    Dr. Garcia also found that Plaintiff had constant

14   deficiencies in concentration, persistence, or pace which resulted in a failure to complete

15   tasks in a timely manner.  (*Id.*)  Dr. Garcia concluded Plaintiff would be unable to sustain

16   work on a regular and continuing basis, eight hours a day, five days per week.  (Tr. 443.)

17   The separate pain assessment contained identical findings.  (*Compare* Tr. 439-40 *with*

18   Tr. 441-43.)

19       In 2012, Dr. Garcia provided an updated a physical capacities assessment and

20   fibromyalgia RFC questionnaire.  (Tr. 902-04, 905-06.)  On the physical capacities

21   assessment, although the note is partially cut off, Dr. Garcia stated "I don't feel qualified

22   to answer these [illegible]."  (Tr. 902.)  Therefore, Plaintiff states that he does not rely on

23   the May 2012 physical capacities assessment.  (Doc. 25 at 11.)  On the 2012 fibromyalgia

24   RFC questionnaire, Dr. Garcia confirmed that Plaintiff's fibromyalgia met criteria

25   established by the American College of Rheumatology, with associated symptoms similar

26   to those on the previous fibromyalgia assessment.  (Tr. 905.)  He opined that Plaintiff's

27   pain and fatigue were severe, with constant deficiencies of concentration, persistence, or

28   pace leading to the inability to complete tasks in a timely manner.  (Tr. 906-07.)  Dr.

1    Garcia again concluded that Plaintiff would be unable to sustain work on a regular and
2    continuing basis.  (Tr. 907.)

3    **III.    Administrative Hearing Testimony**

4              Plaintiff was fifty-four years old at the time of the administrative hearing and the
5    ALJ's  decision  in  June  2012.    (Tr. 44.)    He  had  a  high  school  education  and  had
6    completed  two  years  of  college.    (Tr. 235.)    His  past  relevant  work  included  word
7    processing  supervisor.    (Tr. 70.)    Plaintiff  testified  that  his  health  had  continued  to
8    deteriorate since he stopped working in 2004.  (Tr. 45.)  He testified that his predominant
9    symptom was fatigue.  (Tr. 46-48.)  Plaintiff testified that he laid down about six hours of
10   a  typical  eight-hour  day.    (Tr. 64.)    Plaintiff  also  testified  that  he  experienced  pain
11   scattered  throughout  his  body,  including  his  shoulders,  arms,  back,  buttocks,  and  legs.
12   (Tr. 55.)  Plaintiff testified he also had bladder problems and frequently had to urinate.
13   (Tr. 54, 66-67.)

14             The vocational expert, Gale Tichauer, testified in response to a question from the
15   ALJ  that  an  individual  with  the  limitations  assessment  by  the  state  agency  reviewing
16   physician could perform Plaintiff's past work as a word processor supervisor.  (Tr. 71.)
17   The vocational expert also testified that the limitations secondary to pain and fatigue that
18   Dr. Garcia  assessed  would  preclude  all  sustained  work.    (Tr. 74-75.)    The  vocational
19   expert also concluded that the limitations to which Plaintiff testified, including the need
20   to lay down the majority of a typical day, would preclude all sustained work.  (Tr. 75.)

21   **IV.    The ALJ's Decision**

22             A claimant is considered disabled under the Social Security Act if he is unable "to
23   engage  in  any  substantial  gainful  activity  by  reason  of  any  medically  determinable
24   physical  or  mental  impairment  which  can  be  expected  to  result  in  death  or  which  has
25   lasted  or  can  be  expected  to  last  for  a  continuous  period  of  not  less  than  12  months."
26   42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A) (nearly identical standard
27   for supplemental security income disability insurance benefits).  To determine whether a

28

1    claimant is disabled, the ALJ uses a five-step sequential evaluation process.   *See*

2    20 C.F.R. §§ 404.1520, 416.920.

3         **A.     Five-Step Evaluation Process**

4         In the first two steps, a claimant seeking disability benefits must initially

5    demonstrate (1) that he is not presently engaged in a substantial gainful activity, and

6    (2) that his disability is severe.   20 C.F.R. § 404.1520(a)(4)(i) and (ii).   If a claimant

7    meets steps one and two, he may be found disabled in two ways at steps three through

8    five.   At step three, he may prove that his impairment or combination of impairments

9    meets or equals an impairment in the Listing of Impairments found in Appendix 1 to

10   Subpart P of 20 C.F.R. pt. 404. 20 C.F.R. § 404.1520(a)(4)(iii).   If so, the claimant is

11   presumptively disabled.     If not, the ALJ determines the claimant's RFC.     20

12   C.F.R. § 404.1520(e).   At step four, the ALJ determines whether a claimant's RFC

13   precludes performance of his past work.   20 C.F.R. §  404.1520(a)(4)(iv).   If the claimant

14   establishes this prima facie case, the burden shifts to the government at step five to

15   establish that the claimant can perform other jobs that exist in significant number in the

16   national economy, considering the claimant's RFC, age, work experience, and education.

17   20 C.F.R. § 404.1520(a)(4)(v).   If the government does not meet this burden, then the

18   claimant is considered disabled within the meaning of the Act.

19        **B.     The ALJ's Application of Five-Step Evaluation Process**

20        Applying the five-step sequential evaluation process, the ALJ found that Plaintiff

21   had not engaged in substantial gainful activity since November 30, 2008, the alleged

22   disability onset date.   (Tr. 19.)   At step two, the ALJ found that Plaintiff had the

23   following severe impairments: "fibromyalgia; rheumatoid arthritis; cervical degenerative

24   disc disease; status-post fusion 2002; lumbar degenerative disc disease; history of chronic

25   obstructive pulmonary disease; irritable bowel syndrome; prostatitis; dizziness; cerebral

26   vascular accident; and hypovitaminosis D (20 C.F.R. 404.1520(c) and 416.920(c))."   (*Id.*)

27   At the third step, the ALJ found that the severity of those impairments did not meet or

28   medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P,

1    Appendix 1.  (Tr. 21.)   The ALJ next concluded that Plaintiff retained the RFC "to

2    perform light work as defined in 20 C.F.R.§ 404.1567(b) and 416.967(b)."  (Tr. 21.)  The

3    ALJ further found that Plaintiff was limited to occasional balancing, stooping, crouching,

4    kneeling, crawling, and climbing of ramps and stairs.  (*Id.*)  She also found that Plaintiff

5    should never climb ladders, ropes, or scaffolds.  (*Id.*)  The ALJ further found that

6    Plaintiff should avoid concentrated exposure to pulmonary irritants, such as fumes, odors,

7    dust, gasses, poorly ventilated areas, and chemicals.  (*Id.*)  She also found that Plaintiff

8    "should avoid even moderate exposure to dangerous machinery with moving mechanical

9    parts, and high, exposed unprotected heights."  (*Id.*)  At step four, the ALJ found that

10   Plaintiff could perform his past relevant work as a word processing supervisor.  (Tr. 28.)

11   The ALJ concluded that Plaintiff was not disabled within the meaning of the Act.  (*Id.*)

12   **V.    Standard of Review**

13       The district court has the "power to enter, upon the pleadings and transcript of

14   record, a judgment affirming, modifying, or reversing the decision of the Commissioner,

15   with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The district

16   court reviews the Commissioner's final decision under the substantial evidence standard

17   and must affirm the Commissioner's decision if it is supported by substantial evidence

18   and it is free from legal error.  *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198

19   (9th Cir. 2008); *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).  Even if the ALJ

20   erred, however, "[a] decision of the ALJ will not be reversed for errors that are

21   harmless."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

22       Substantial evidence means more than a mere scintilla, but less than a

23   preponderance; it is "such relevant evidence as a reasonable mind might accept as

24   adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

25   (citations omitted); *see also Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).  In

26   determining whether substantial evidence supports a decision, the court considers the

27   record as a whole and "may not affirm simply by isolating a specific quantum of

28

1  supporting evidence."  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal

2  quotation and citation omitted).

3      The ALJ is responsible for resolving conflicts in testimony, determining

4  credibility, and resolving ambiguities.  *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th

5  Cir. 1995).  "When the evidence before the ALJ is subject to more than one rational

6  interpretation, [the court] must defer to the ALJ's conclusion."  *Batson v. Comm'r of Soc.*

7  *Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) (citing *Andrews*, 53 F.3d at 1041).

8  **VI.    Analysis of Plaintiff's Claims**

9      Plaintiff argues that the ALJ erred by rejecting several of Dr. Garcia's opinions

10 and by rejecting Plaintiff's symptom testimony.  (Doc. 25 at 1.)  The record reflects that

11 Dr. Garcia completed several assessments related to Plaintiff's functional limitations (*see*

12 Section II.B.4) and that the ALJ rejected all of Dr. Garcia's opinions.   (Tr. 27-28.)

13 However, Plaintiff's claim of error is limited to the ALJ's rejection of Dr. Garcia's

14 opinions on the July 2010 and 2012 pain and fibromyalgia RFC questionnaires.[4]

15 (Tr. 439-440, 441-43; 905-07.)

16      **A.    Weighing Medical Source Opinions**

17     In weighing medical source evidence, the Ninth Circuit distinguishes between

18 three types of physicians: (1) treating physicians, who treat the claimant; (2) examining

19 physicians, who examine but do not treat the claimant; and (3) non-examining physicians,

20 who neither treat nor examine the claimant.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.

21 1995).  Generally, more weight is given to a treating physician's opinion.  *Id*.  The ALJ

22 must provide clear and convincing reasons supported by substantial evidence for

23 rejecting a treating or an examining physician's uncontradicted opinion.  *Id*.; *Reddick v.*

24 *Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  An ALJ may reject the controverted opinion

25 of a treating or an examining physician by providing specific and legitimate reasons that

26 ─────────────────

27     [4]  Plaintiff states that Dr. Garcia's July 2010 physical capacities assessment is
   irrelevant to his appeal.  (Doc. 25 at 10.)  Similarly, Plaintiff states that he does not rely
   on Dr. Garcia's May 2012 physical capacities assessment.  (Doc. 25 at 11.)  Plaintiff's
28 opening brief does not challenge the ALJ's rejection of Dr. Garcia's opinions on these
   assessments.  (Doc. 25.)

1   are supported by substantial evidence in the record.  *Bayliss v. Barnhart*, 427 F.3d 1211,

2   1216 (9th Cir. 2005); *Reddick*, 157 F.3d at 725.

3        Opinions from non-examining medical sources are entitled to less weight than

4   opinions from treating or examining physicians.  *Lester*, 81 F.3d at 831.  Although an

5   ALJ generally gives more weight to an examining physician's opinion than to a non-

6   examining physician's opinion, a non-examining physician's opinion may nonetheless

7   constitute substantial evidence if it is consistent with other independent evidence in the

8   record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).   When evaluating

9   medical opinion evidence, the ALJ may consider "the amount of relevant evidence that

10  supports the opinion and the quality of the explanation provided; the consistency of the

11  medical opinion with the record as a whole; [and] the specialty of the physician providing

12  the opinion . . . ."  *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).

13  **B.     Weight Assigned Dr. Garcia's Opinions**

14       On July 15, 2010, Dr. Garcia completed a pain RFC questionnaire in which he

15  opined that Plaintiff had severe pain that constantly interfered with his attention and

16  concentration, and that would result in a failure to complete tasks in a timely manner.

17  (Tr. 439-40.)  On July 15, 2010 and in 2012, Dr. Garcia completed fibromyalgia RFC

18  questionnaires.  (Tr. 441-43, 905-07.)  In those questionnaires, he opined that Plaintiff

19  met the American College of Rheumatology's criteria for fibromyalgia, and that he had

20  severe pain and fatigue that interfered with his attention and concentration "constantly,"

21  and that resulted in a failure to complete tasks in a timely manner.[5]  (*Id.*)   The ALJ

22  rejected these opinions.[6]   (Tr. 28.)   She explained that Dr. Garcia's opinions were

23  _____

24       [5]  The Commissioner argues that because Plaintiff states that his appeal is limited
     to his physical impairments and that psychological examinations in the record are
25   "unimportant," the Court should not consider Plaintiff's arguments that his symptoms
     related to fibromyalgia interfered with is ability to concentrate and perform other work-
26   related mental functions.  (Doc. 29 at 10 (citing Doc. 25 at 23-24).)  The Court rejects the
     Commissioner's argument.  Although Plaintiff indicates that his opening brief focuses on
27   his physical impairments, he does not limit his claims to his physical functional
     limitations, as opposed to nonexertional limitations, caused by those impairments.

28       [6]  Dr. Garcia gave similar opinions on the 2010 pain RFC questionnaire and the
     ALJ rejected those opinions.  Because the opinions on the pain RFC questionnaire are the

1   inconsistent with the medical record and testing, did not include specific work

2   limitations, were vague, imprecise, and did not define terms, and were outside the

3   primary care physician's specialty.  (*Id.*)   She also stated that the 2012 opinion was

4   "extreme and sympathetic" and noted that Dr. Garcia indicated that he was

5   uncomfortable completing forms.  (*Id.*)

6                **1.      Opinions Inconsistent with Testing and the Medical Record**

7          As Plaintiff argues, the ALJ erred in rejecting Dr. Garcia's opinions on the pain

8   and fibromyalgia questionnaires as inconsistent with testing and the medical record.  As

9   the ALJ noted, the record reflects that objective medical testing from 2008 to 2012

10   showed normal results or minimal findings.  (Tr. 23 (citing Admin. Hrg. Ex. 38F at 2,

11   Ex. 5F)); Tr. 24 (citing Admin. Hrg. Exs. 8F, 46F at 1, 20F at 9-10, 32F at 1-5, 42F at 6,

12   33F at 1, 23 F at 2, and 40F at 6)).)  However, the ALJ did not explain how these minimal

13   or normal results on objective tests provided a basis for discounting Dr. Garcia's opinion

14   that Plaintiff's fibromyalgia caused severe pain and fatigue.  (Tr. 28.)

15          Plaintiff argues that is was error for the ALJ to reject Dr. Garcia's opinions based

16   on a lack of objective medical support because fibromyalgia does not produce positive

17   laboratory tests or similar objective evidence.  (Doc. 25 at 22.)  The Commissioner does

18   not address this argument in its response.  (Doc. 29.)  The Ninth Circuit has recognized

19   that fibromyalgia eludes objective measurement.  *See Benecke v. Barnhart*, 379 F.3d 587,

20   590 (9th Cir. 2004) ("Fibromyalgia's cause is unknown, there is no cure, and it is poorly-

21   understood within much of the medical community.  The disease is diagnosed entirely on

22   the basis of patients' reports of pain and other symptoms."); *see also Jordan v. Northrop*

23   *Grumman Corp.*, 370 F.3d 869, 872 (9th Cir. 2004) (fibromyalgia's "symptoms are

24   entirely subjective.   There are no laboratory tests for [its] presence or severity"),

25   *overruled on other grounds by Abatie v. Alta Health & Life Ins. Co.*, 258 F.3d 955, 969

26

27

28   same as those on the fibromyalgia questionnaire, the Court's discusses the opinions
     together.

(9th Cir. 2006) (en banc); *Lang v. Long–Term Disability Plan of Sponsor Applied Remote Tech., Inc.*, 125 F.3d 794, 796 (9th Cir. 1997) (same).

As the Ninth Circuit has explained, "[t]he American College of Rheumatology [has] issued a set of agreed-upon diagnostic criteria in 1990, but to date there are no laboratory tests to confirm the diagnosis." *Benecke,* 379 F.3d at 590. The accepted diagnostic test for fibromyalgia is that an individual must have pain in eleven of eighteen tender points. *See Jordan*, 370 F.3d at 877; *see also Rollins v. Massanari*, 261 F.3d 853, 855 (9th Cir. 2001) (claimant had eleven of eighteen tender points). Here, Dr. Colceriu found that Plaintiff had eighteen of eighteen tender points. (Tr. 565.) Therefore, the lack of objective medical evidence of the severity of Plaintiff's symptoms of fibromyalgia, pain and fatigue, was not a legally sufficient reason for rejecting Dr. Garcia's fibromyalgia assessments.

The ALJ also rejected Dr. Garcia's opinions on the fibromyalgia RFC questionnaires as inconsistent with the medical record. (Tr. 28.) Because the ALJ referred to the medical record and medical testing separately (*id.*), it is reasonable to assume that the ALJ's reference to the "medical record," refers to the medical providers' treatment notes. The ALJ does not specifically identify the portions of the medical record with which Dr. Garcia's opinions are inconsistent. However, earlier in her decision, the ALJ cited treatment notes indicating that Plaintiff had a normal gait, could squat and stand, had normal coordination (Tr. 24 (citing Admin. Hrg. Ex. 7F)); had no synovitis, an intact handgrip, could walk without assistance (Tr. 24 (citing Admin. Hrg. Ex. 13F at 2)), sat comfortably, could heel-toe and tandem walk, had a negative straight leg test, had full strength in his extremities (Tr. 24-25 (citing Admin. Hrg. Ex. 24F)), ambulated independently and had a normal hand grip (Tr. 25 (citing Admin. Hrg. Ex. 34F at 6)); had a normal gait and station, could participate in an exercise program, and had no crepitation or contracture. (Tr. 25 (citing Admin. Hrg. Ex. 36F at 1-4).)

These examination findings, however, do not detract from Dr. Garcia's opinions regarding the severity of Plaintiff's pain and fatigue associated with his fibromyalgia

because "physical examinations [of patients complaining of pain from fibromyalgia] will usually yield normal results — a full range of motion, no swelling, as well as normal muscle strength and neurological reactions."  *Preston v. Sec. of Health & Human Servs.*, 854 F.2d 815, 817-18 (6th Cir. 1988) (noting that "in stark contrast to the unremitting pain of which fibrositis[7] patients complain," they usually exhibit a full range of motion, no joint swelling, and normal muscle strength and neurological reactions).

Additionally, the ALJ did not discuss notations in the treatment notes that Plaintiff had pain, fatigue, multiple tender points, muscle spasm, and inability to sleep, (Tr. 329, 330, 392-94, 396-97, 445, 450-51, 523, 526, 558, 565, 567, 569, 573-74.)  The ALJ also did not discuss Dr. Colceriu's repeated diagnoses of fibromyalgia, chronic pain syndrome, and fatigue (Tr. 393, 565, 567, 574), or note that Dr. Colceriu regularly prescribed medication to treat Plaintiff's symptoms related to fibromyalgia, including Neurontin and Savella. (Tr. 395, 570, 573, 654.)   Thus, the ALJ erred in rejecting Dr. Garcia's opinions on the pain and fibromyalgia RFC questionnaires as inconsistent with medical testing and the medical record.

## 2.    Lack of Specific Work Limitations and Imprecision

The ALJ also explained that that she rejected Dr. Garcia's opinions on the pain and fibromyalgia RFC questionnaires because the questionnaires did not include specific work limitations and were "vague and imprecise and [did] not define terms."  (Tr. 28.) As Plaintiff argues, the record does not support this reason for the ALJ's rejection of Dr. Garcia's opinions.   The Commissioner does not defend this reason for the ALJ's rejection of Dr. Garcia's opinion.  (Doc. 29.)

The pain and fibromyalgia RFC questionnaires define the word "severe" as "extremely impaired due to pain [or fatigue] which precludes ability to function." (Tr. 439, 442, 906.)  The pain and fibromyalgia RFC questionnaires do not specifically define "constantly," which was how Dr. Garcia described the frequency of Plaintiff's pain and fatigue as being sufficiently severe to interfere with attention and concentration,

---

[7] Fibromyaglia was previously called fibrositis.  *See Benecke*, 379 F.3d at 589.

and how he described the frequency of his pain and fatigue that interfered with concentration, persistence, or pace resulting in a failure to timely complete tasks. (Tr. 439-40, 443, 907)   However, the word constantly appeared on a continuum of descriptive options that included "never" "seldom" "often" "frequently" and "constantly." (*Id.*)   Thus, terms on the pain and fibromyalgia RFC questionnaires were not vague, imprecise, or lacking definition.

Also, the pain and fibromyalgia RFC questionnaires did not lack specific work limitations.   The ability to pay attention, concentrate, and complete tasks in a timely manner are all work-related abilities and the RFC questionnaires indicated that Plaintiff's pain and fatigue limited those abilities by constantly interfering with attention and concentration, and constantly resulted "in failure to complete tasks in timely manner (in work settings or elsewhere)." (Tr. 439-40, 443, 907.)   The regulations recognize that a claimant's impairments may result in nonexertional limitations, such as "maintaining attention or concentrating." 20 C.F.R. §§ 404.1569a(c)(ii), 416.969a(c)(ii).   Additionally, the vocational expert at the administrative hearing had no difficulty responding to hypothetical questions that included these limitations. (Tr. 74.)   She testified that an individual who "experienced severe pain" that "constantly . . . inferred with attention and concentration, and [who] constantly experienced deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner" could not sustain work. (*Id.*)   Therefore, the ALJ erred by rejecting Dr. Garcia's opinions on the pain and fibromyalgia RFC questionnaires based on the ALJ's conclusion that the questionnaires contained no work limitations and were vague, imprecise, and included undefined terms.

### 3.   Opinions Outside of Primary Care Physician's Specialty

The ALJ also explained that she rejected Dr. Garcia's opinions on the pain and fibromyalgia RFC questionnaires because fibromyalgia was outside the primary care physician's specialty. (Tr. 28.)   Plaintiff argues that this is not a legally sufficient reason for discounting Dr. Garcia's opinions because Dr. Garcia was provided with the records

1    of Dr. Colceriu, a rheumatologist, and referred to them in his treatment notes.  (Doc. 25 at

2    24 (citing Tr. 450, 446, 500, 558).)   Plaintiff also cites a Ninth Circuit case for the

3    proposition that the "treating physician's role is to take into account all the available

4    information regarding all of his patients impairments — including the findings and

5    opinions of other experts."  *Lester*, 81 F.3d at 833.  The Commissioner has not responded

6    to Plaintiff's arguments.  (Doc. 29.)

7           The Court agrees that the ALJ erred in rejecting Dr. Garcia's opinions because he

8    was not a specialist in fibromyalgia, or a rheumatologist.   Dr. Garcia was Plaintiff's

9    primary care physician and treated Plaintiff for a long period of time.   He referred

10   Plaintiff to Dr. Colceriu and received copies of Dr. Colceriu's treatment records.

11   (Tr. 396, 446, 500, 523, 559.)  He also continued treating Plaintiff while he was under

12   Dr. Colceriu's care.  (*Id*.)  Although Dr. Garcia was not a rheumatologist, a specialist's

13   opinion is not required to support a finding of disability, *see* 20 C.F.R. § 404.1527, and

14   the Commissioner has not cited any authority to support the ALJ's conclusion that

15   Dr. Garcia's opinion should be rejected on that basis.

16                    **4.      Extreme and Sympathetic Opinion**

17          The ALJ also rejected Dr. Garcia's opinion on the 2012 fibromyalgia RFC

18   questionnaire as "extreme and sympathetic."  (Tr. 28.)   The Commissioner does not

19   defend this rationale (Doc. 29), and these general assertions are not legally sufficient

20   reasons for rejecting Dr. Garcia's opinion.  *See Haulot v. Astrue*, 290 Fed. App'x 53, 54

21   (9th Cir. 2008) (holding an ALJ's statement that treating doctor was "sympathetic" to the

22   claimant did not constitute substantial evidence for rejecting his considered diagnosis).

23                    **5.      Reluctance Completing Forms**

24          The ALJ also rejected Dr. Garcia's opinion on the 2012 fibromyalgia RFC

25   questionnaire because Dr. Garcia was "uncomfortable completing forms."  (Tr. 28.)  This

26   rationale is not supported by substantial evidence in the record.  The record reflects that

27   on a Medical Assessment of Ability to Do Work Related Physical Activities (Tr. 902),

28

1   Dr. Garcia wrote, "I don't feel qualified to answer these [illegible]." (*Id.*)  However, the

2   2012 fibromyalgia RFC questionnaire does not include a similar notation.

3         In conclusion, the ALJ did not provide legally sufficient reasons supported by

4   substantial evidence in the record for discounting Dr. Garcia's opinions on the 2010 and

5   2012 pain and fibromyalgia RFC questionnaires.  That error was not harmless because

6   the vocational expert testified that an individual with the limitations resulting from severe

7   pain identified on those questionnaires would be unable to sustain employment.  (Tr. 74.)

8   Accordingly, the Court reverses the Commissioner's disability determination.

9   **VII.    Whether to Remand for Benefits or Further Proceedings**

10        After deciding to vacate the Commissioner's decision, the Court has the discretion

11  to remand the case for further development of the record or for an award benefits.  *See*

12  *Reddick*, 157 F.3d at 728.  The Ninth Circuit has held that evidence should be credited as

13  true and an action remanded for an immediate award of benefits only when three

14  conditions are met: "(1) the record has been fully developed and further administrative

15  proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally

16  sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion;

17  and (3) if the improperly discredited evidence were credited as true, the ALJ would be

18  required to find the claimant disabled on remand."  *Garrison v. Colvin*, 759 F.3d 995,

19  1020 (9th Cir. 2014).  In *Garrison,* the Court clarified that "when the court conclude[s]

20  that a claimant is otherwise entitled to an immediate award of benefits under the credit-

21  as-true analysis, [its earlier decision in *Connett v. Barnhart*, 340 F.3d 871 (9th Cir.

22  2003)] allows flexibility to remand for further proceedings when the record as a whole

23  creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of

24  the Social Security Act."  *Id.* at 1021.

25        Plaintiff does not satisfy the third condition of the credit-as true rule.  Even if the

26  Court credits as true Dr. Garcia's opinions on the pain and fibromyalgia RFC

27  questionnaires, the Court cannot determine from these opinions when Plaintiff became

28  disabled and whether he was disabled during the relevant time period.  Thus, there are

1    "outstanding issues that must be resolved before a determination of disability can be

2    made." *Garrison*, 759 F.3d at 1020 n.26.

3           The Social Security regulations indicate that determination of a disability onset

4    date is a complex and fact-specific inquiry.  SSR 83-20, 1983 WL 31249, at *2-3.  In this

5    case, "the onset date is critical; it may affect the period for which [Plaintiff] can be paid

6    and may even be determinative of whether [he] is entitled to or eligible for any benefits."

7    *Id.* at *1.  "The date at which [Plaintiff's] disability began will determine whether he is

8    eligible for Disability Insurance Benefits and the amount of Supplement Security Income

9    to which he is entitled."  *Reginnitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1300

10   (9th Cir. 1999).

11          Additionally, a claimant must demonstrate disability began before the date last

12   insured to receive disability insurance benefits under Title II.  *See Lester v. Chater*, 81

13   F.3d 821, 825 (9th Cir. 1996); *Lingenfelter v. Astrue*, 504 F.3d 1028, 1033 (9th Cir.

14   2007) (stating that a claimant must establish disability for at least a twelve-month period

15   "between the alleged onset date" and the date last insured); 42 U.S.C. § 423(a)(1)(A) (a

16   claimant must show that the disability began any time while he was insured for disability

17   insurance benefits).  Plaintiff states that his insured status for disability insurance benefits

18   expired on December 31, 2009.  (Doc. 25 at 2, 20.)  Accordingly, Plaintiff has to

19   establish that he was disabled for at least a twelve-month period between the alleged

20   onset date and December 31, 2009 (the relevant time period).

21          However, Dr. Garcia's opinions are all dated after Plaintiff's date last insured.

22   (Tr. 439-440, 441-43, 905-07.)  In addition, although the treatment records show that

23   Plaintiff reported some pain and tenderness related to arthralgia in early 2009 (Tr. 329-

24   300), it does not appear that he was treated specifically for fibromyalgia until around

25   May 2010 (Tr. 396), and he was not diagnosed with eighteen of eighteen fibromyalgia

26   tender points until 2011.  (Tr. 565.)  Thus, the date on which Plaintiff became disabled

27   and the duration of his disability are unresolved.

28

1      Accordingly, the Court finds that *Regennitter* supports remanding this matter for

2  further proceedings.  In that case, the Ninth Circuit concluded that a claimant's testimony

3  and her doctor's opinion should have been credited, and that doing so would have

4  required a finding of disability and a remand for payment of benefits, but that the

5  unresolved issue of that claimant's disability onset date prevented such a remand.

6  *Regennitter*, 166 F.3d at 1300; *see also Luna v. Astrue*, 623 F.3d 1032, 1035 (9th Cir.

7  2010) (concluding that remand for an award of benefits under the credit-as-true rule was

8  unwarranted due to the "outstanding issue" of "when Luna's disability began").

9  Accordingly, the Court reverses that ALJ's decision and remands this case to the

10 Commissioner to resolve the disability onset date issue, determine whether Plaintiff was

11 disabled during the relevant time period, and to make an ultimate disposition consistent

12 with this determination.  *See Regennitter*, 166 F.3d at 1300.

13     Accordingly,

14     **IT IS ORDERED** that the Commissioner's decision is reversed and this matter is

15 remanded for further proceedings as set forth in this Order.

16     **IT IS FURTHER ORDERED** that the Clerk of Court is directed to enter

17 judgment in Plaintiff's favor and terminate this matter.

18     Dated this 19th day of February, 2015.

19

20 _____

21 Bridget S. Bade

    United States Magistrate Judge

22

23

24

25

26

27

28